UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

EMMANUEL SCOTT                          CIVIL ACTION NO. 12-cv-1931

VERSUS                                  JUDGE FOOTE

BURL CAIN                               MAGISTRATE JUDGE HORNSBY

## REPORT AND RECOMMENDATION

### Introduction

After a bench trial before Caddo Parish district judge Jeanette Garrett, Tiffany Woods and Emmanuel Scott were convicted of the second-degree murder of their five-month old child. Each was sentenced to mandatory life in prison. The convictions and sentences were affirmed on direct appeal. State v. Woods & Scott, 16 So.3d 1279 (La. App. 2d Cir. 2009), writ denied, 31 So.3d 380 (La. 2010). The defendants also pursued post-conviction applications in state court. Ms. Woods filed a federal habeas petition with this court, but it was dismissed as untimely. Woods v. Warden, 2013 WL 6284521 (W. D. La. 2013). Petitioner now seeks federal habeas relief based on his claims of insufficiency of the evidence and ineffective assistance of counsel. His petition is timely, but it is recommended for the reasons that follow that the petition be denied on the merits.

### Trial Evidence

#### A.  Introduction

Petitioner and Tiffany Woods had a common-law relationship in New Orleans. Ms. Woods had two children of her own, and Petitioner had one child. Together they produced

a baby boy who was born prematurely on June 23, 2005.  They  named him Emmanuel Scott, Jr. and sometimes called him Little Emmanuel.  Hurricane Katrina struck the New Orleans area in August 2005, and the family evacuated to Shreveport, where they lived in shelters for several weeks before moving into a house.

On November 27, 2005, when the child was just over five months old, a 911 call was placed to express concern about him.  Emergency personnel found the child dead in his crib. He was severely emaciated, and the coroner ruled the cause of death to be malnutrition.

Little Emmanuel weighed only 3 lbs., 2 oz. at birth.  When he was released from the hospital on August 2, 2005 he weighed 5 lbs., 6 oz.  When he died almost four months later, he had grown from 17.7 inches long upon release from the hospital to 22 inches, but his weight had increased only seven ounces to 5 lbs., 13 oz.  The State charged both parents with second-degree murder, which includes the killing of a human being when the offender is engaged in the perpetration of cruelty to a juvenile, even though the offender has no specific intent to kill or inflict great bodily harm.  The parents argued that the child was fed but did not take food well and died from a medical abnormality.

### B.  Corporal Patrick McConnell

Corporal Patrick McConnell (Tr. 231-48) testified that when he arrived at the home the child was inside a medic unit, where McConnell saw him to be "very, very thin" with arms and legs the size of pencils, and with mucus around his mouth.  McConnell said the condition of the home was "pristine" compared to the houses he usually entered on his job. The refrigerator contained organic milk, water, some food products, condiments, beer, and

other items.  There were boxes and jars of baby food on top of the refrigerator.  Three other children were in the home, but only one of them, a toddler, looked to be of the age to still be eating baby food.

McConnell saw a bedroom that contained a playpen and infant bed.  The bed contained two bottles with a white fluid in them that appeared to be milk. A heart/lung monitor was located in a closet.  McConnell said the demeanor of the parents was that they "seemed to be fine" and "weren't upset."  McConnell's interviews with the couple were recorded and played at trial.  The recordings were not transcribed by the court reporter, so they do not appear in the trial transcript filed with this court.

### C.  Detective Rod Johnson

Detective Rod Johnson (Tr. 248-52) testified that he learned during his investigation that the family noticed a problem with the child around 11:15 a.m. but did not call for help until 12:40 p.m.  Johnson said he found a heart monitor in the top of a closet.  He turned it on, and it made beeping sounds, but he shut it off because he did not know how to operate it.  He also saw the bottles in the crib and testified they appeared to be almost full.

### D.  Beverly Hunter

Beverly Hunter (Tr. 252-66), a social worker, testified that she arrived at the house a little after 1:00 p.m.  The other children in the home were two boys, ages 8 and 5, and a 13-month old girl.  The children were "basically unkempt," with the little girl "very dirty to the point of smelling."  The little girl had "major mucus dried up all over her face," and she was

very lethargic.  When the children were taken from the home, Ms. Wood refused to tell them goodbye, and the children did not seem to be too upset at leaving.

Ms. Hunter spoke with Ms. Woods and tried to talk to her about the grief process. Woods said, "I'm not grieving."  Ms. Hunter specifically recalled that Woods also said, "When I found it, it was stiff.  It was going to die.  I didn't kill it, and it was going to die anyway."  Hunter had a brief conversation with Petitioner, who admitted that scratches on his face and neck stemmed from an altercation with Ms. Woods the night before.  There were other indications that the family was no stranger to violence.  Petitioner told Hunter that he did not know anything was wrong with the child and that it had been fine.

### E.  Dr. Frank Peretti

Dr. Frank Peretti (Tr. 266-95) performed the autopsy of the child.  His first impression was that the child was severely cachectic (having physical wasting with loss of weight and muscle mass) and malnourished.  He attempted to rule out various causes of death.  There was no evidence of trauma or disease.  The child's gastrointestinal system showed no indication of inflammation or other problems that would suggest disease.  There was no pyloric stenosis, which sometimes interferes with a baby's ability to consume food.  The child was "devoid of fat," which indicated the body used its fat up as nutrition.  There was a high rate of blood urea nitrogen, which indicated the child was in kidney failure because of malnutrition.  Dr. Peretti said the very high level indicated that the lack of nutrition was an ongoing process, for some months.  The child also had inspissated (hard) feces throughout the intestinal tract, which indicated extreme constipation from lack of water.

Dr. Peretti ruled out metabolic disorders, which are usually indicated by an abundance of fat on the liver.  He said that all babies, even premature ones, are born with a certain amount of fat in the body.  If the child has a metabolic disorder such as Medium Chain AcylCoA Dehydrogenase Deficiency ("MCAD"), the child is unable to use its own fat to sustain itself.  The disorder causes fat to be deposited in the kidney, heart, and liver, and Dr. Peretti said there were no such fat deposits.  He said the disorder also causes children to have cerebral edema, or swelling of the brain, and the child did not have that condition.

### F.  Dr. Gerald Whitton

Dr. Gerald Whitton (Tr. 297-359) was the medical director of the neonatal intensive care unit at Willis-Knighton Healthcare System.  He was board certified in general pediatrics, as well as neonatal and perinatal medicine.  The majority of his daily practice included caring for premature babies.  In preparing to testify for the State, he reviewed the child's medical records from Tulane Medical Center and Dr. Peretti's autopsy report.

He testified that the records showed the child was born at 31 weeks and three days gestation by emergency caesarian section due to a placental abruption.  The child weighed 3 lbs., 2 oz.  It had respiratory distress that required intubation and ventilation for less than 12 hours, after which the child had no specific respiratory problems or any other major complications.

Routine  screening for metabolic problems was positive for MCAD, but the test is more likely to yield a false positive when a child is premature.  Genetics testing was done to confirm the result, and it indicated that the baby did not have any evidence of MCAD or

other genetic or metabolic disease.  Dr. Whitton said he had reviewed the autopsy report and that it corroborated his conclusion that the child did not have MCAD.

The child was first fed with a feeding tube and then progressed to nipple feedings. He was able to gain adequate weight, but he was in the bottom 10% for his gestation.  Dr. Whitton said that the child's weight at the time of his death indicated that he did not continue on that 10th percentile growth curve.  Rather, the curve was basically flat from the time of discharge to the time of death.  The child had been gaining approximately one ounce per day at the time of discharge, and Dr. Whitton saw no medical reason the child was incapable of taking in nutrition and continuing to gain weight.

Dr. Whitton said that infant formula or breast milk is by far the best food of choice for a baby.  Cow milk is lower in iron, and it has more sodium and electrolytes that a baby's kidneys may not be able to handle.  Nonetheless, a child who was fed cow milk or milk cut with water could get enough calories to sustain life even if the child had anemia or other problems.  The child would not have optimal growth, but it would continue to have growth. It was Whitton's opinion that the child died from malnourishment, and it would have taken some time for the child to deteriorate to the emaciated condition he was in at the time of death.

It was discussed on cross-examination that there were references in the medical records to some kind of genetic test going awry.  The child also had a follow-up appointment with the genetics lab on August 18, 2005, but the patient did not appear for the appointment. Dr. Whitton said that there had been three independent tests done at Tulane to exclude

MCAD after the screen,[1] and none of them were positive.  He added that the absence of fatty deposits on the organs also indicated that the child did not have MCAD.

### G.  Petitioner

Petitioner (Tr. 363-87) testified that he was working as a breakfast cook when the family lived in New Orleans.  Ms. Woods went to a parenting class, but he did not attend because of his work schedule.  He said the baby was small but was eating when he first came home.  Ms. Woods was generally responsible for the child's care, because she spent more time at home, but Petitioner sometimes fed the child.  He said the baby, like his oldest daughter, would spit up or vomit most of the time.

After the family evacuated to shelters in Shreveport, medical staff sometimes looked at the child, and they always returned him to the couple.  Petitioner said he thought that whatever they were doing was the best they could, and they did not know there was any problem.

Petitioner got a job at McDonald's working eight-hour shifts.  Ms. Woods stayed home to care for the children.  About two weeks before the child died, the family's WIC benefits expired.  The baby was "really spitting up his milk," so they decided to see if he liked organic milk, which he drank with "no problem."  Petitioner said that he realized the child did not seem to be gaining weight, but he had always appeared small to Petitioner, so

_____

[1]Dr. Whitton described the three tests as plasma acyl carnitine, total and free carnitine level, and urine organic acid analysis.

Petitioner did not see that there was a problem. Petitioner took the baby to a Shots for Tots program in September, and "Nobody said nothing was wrong."

Petitioner testified that he worked the night before the child died. He came home and went to bed. He got up early the next morning. He did not "really check on him," but he could see the child who appeared to be asleep. Ms. Woods said they needed to go get Pampers. They were preparing to put the children in the car when Ms. Woods noticed something was wrong with the baby's mouth. Petitioner said the child's mouth was "sucked in," and he instantly grabbed him and started doing CPR. Woods called 911. The two traded places at one point, and Petitioner spoke to the 911 operator. Petitioner said he thought the child would recover because he heard him gagging for air during the CPR. He said this accounted for his lack of emotion at the scene, because no one had told him the child was dead, and he thought the child would recover.

### H. Tiffany Woods

Tiffany Woods (Tr. 443-91) testified that she spent a night at the NICU shortly before the baby was discharged. She was shown a video on CPR. She fed the baby bottles, but she was not instructed or supervised regarding feeding. When she came home, she followed a feeding schedule for formula, and she gave the child caffeine every day as recommended. She put the baby on a heart monitor, but it continued to give false positives. She tried to call the hospital for help, and she called the number that was on the machine, but the problem with the monitor was not solved.

Woods said that even when she fed the baby at the hospital he "really didn't want to take the bottle."  He eventually did, but he did not take a lot, certainly less than her other children had.  She had to force him to take the bottle, and sometimes he would spit it out. The child did not cry in the night, and she had to wake him to attempt feedings.  The baby threw up, sometimes as much as she fed him.  When he did that, she would try to feed him again.  The problem seemed to get worse after the family came to Shreveport.  Even before the move, the child never took a whole four-ounce bottle.  At most, he drank two or three ounces.

Woods testified that the child seemed to take in more after she switched to cow milk. He was not throwing up as much, but he still threw up.  She never saw any change in his weight from the time he was discharged until he died.  She said she had no signs the child was having health problems other than throwing up.  She said the child "looked normal to me" even the day before he died, and he had meat on his bones.  He traveled with the family to Wal-Mart, to buy diapers and milk, the day before he died.

Woods said Petitioner did not feed the child often, perhaps about five times, because he was always at work.  Their only discussion about problems feeding were when they discussed switching to milk, and Petitioner believed the child would do better with the organic milk than what he had been prescribed. Woods "complied" with the suggestion. She says it was a "stupid choice," but she did not know that at the time.

Woods said she would have liked to have taken her child to the doctor in Shreveport, but she did not because she did not know what bus to catch.  She also had a 13-month old that could not walk, plus other children in school, so she was "stuck."

Woods said she remembered the August 18 appointment at Tulane, but she could not make it because it would have made her late to get her other children.  She said she contacted Tulane and rescheduled.  She had managed to attend an August 8 appointment for a checkup.  She did not know the specific purpose of the August 18 appointment.

### I. Dr. Shalinee Singh

Dr. Shalinee Singh (Tr. 394-439) is a pediatrician who was on the faculty at LSU HSC for two years before going to work at Ark-La-Tex Children's Clinic.  She reviewed the Tulane medical records and testified for the defense.

Dr. Singh noted that the infant's newborn screen, required by the State, was referenced in the records but was not actually present.  The screen checks for more than 130 metabolic or newborn problems, including MCAD.  She noted a lack of any social services notes or a discharge pediatrician, and she said she would not discharge such a patient without a pediatric appointment in place.

Dr. Singh noted an assessment of the baby's feeding that indicated the child was not quite meeting his requirements to thrive after oral feeding began.  The records included a recommendation that formula be increased from between 12 and 13 ounces a day to 15.5 ounces per day.  Before that, the child was receiving enough calories to survive but not enough to grow.  During the two weeks before the baby was discharged, the physician noted

repeatedly that intake needed to be increased, but the nurses were unable to have the baby meet its caloric needs even with around-the-clock feeding.  Singh was surprised that the baby was discharged when the nurses, who are professional feeders, could not meet the goals.

Two weeks before discharge, a therapist wrote that the baby was lethargic and a poor feeder, took frequent pauses, and it took a long time to feed the infant.  During the next week, prior to discharge, the therapist could not evaluate the baby's ability to suck because the child was asleep every time she visited.  It concerned Dr. Singh that there was not a proper evaluation of the infant's ability to suck and swallow in the week before discharge.  The therapist notes from the week of July 18-22 said, "I recommended increased feeding trials."  The notes also stated that Ms. Woods attended on a Friday to complete her first feeding of the infant.  Singh said it would have been her recommendation that the infant not be discharged.  She also would have had nurses interact with the family and get reports on their abilities to feed and care for the child at home.  She was not aware that Woods had other children, and she said that fact would have been considered in determining when to discharge.

Dr. Singh said she did not see labs in the records to show that the child did not have a metabolic defect.  She said that "a baby with a metabolic defect, in general, yes, could look like this."  She agreed that if a child had the condition, the feeding in the hospital would have created fat that would end up on the liver and would not break down, but she would not concede that the absence of fatty deposits found in the autopsy ruled out MCAD.  She

acknowledged seeing a letter from a physician at Tulane saying tests had ruled out MCAD, but she said she saw no labs for herself.

With respect to the nutrition notes, Dr. Singh conceded that another part of the notes said the patient was at "low nutritional risk" and was gaining weight.  She also conceded that about half of the feeding sessions were successful.  She opined that if a child in that condition were given 50% milk and 50% water, rather than formula, the baby would be seizing very quickly, perhaps within two or three days, and she doubted a baby could survive two weeks of that diet without observable problems.  She said she heard two or three times a year of parents giving their baby cow milk, but it was always the result of lack of education rather than intent to harm.  She says she hears all kinds of wives' tales about how to raise infants.

**J. Analysis**

Louisiana law defines second-degree murder as the killing of a human being when the offender is engaged in the perpetration of cruelty to juveniles, even though he has no specific intent to kill or inflict great bodily harm.  La. R.S. 14:30.1(A)(1).  Cruelty to a juvenile, relevant to this case, includes the intentionally or criminally negligent mistreatment or neglect of any child whereby unjustifiable pain or suffering is caused to the child.  La. R.S. 14:93.  Criminal negligence exists when, even absent specific or general criminal intent, there is such a disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances.  Criminal negligence can be found from the accused's gross disregard for the consequences of his actions.  La. R.S. 14:12.

Judge Jeanette Garrett gave extensive reasons for her verdict. Tr. 541-65. She stated that she thoroughly reviewed all the exhibits, and she reviewed the testimony from the several witnesses. She found the pictures of the child, taken before and during the autopsy, to be most compelling and absolutely haunting. She had "no doubt" that the child starved to death. As for the medical records, she said she "went through every one of them" and had no doubt Tulane was not going to release the child until he could eat correctly. The parents managed to make it to Shreveport, where they lived in a nice home with furniture and televisions, two vehicles, and a refrigerator stocked with food and drinks. Petitioner had a job, and the family had FEMA assistance money, plus other government benefits.

Judge Garrett described the parents' alleged ignorance of the child's condition as "feigned" and "just an insult to everyone." The child's ribs were obviously sticking out, and he had absolutely no fat on him. The judge recalled that Dr. Singh, the defense witness, had not seen the pictures before trial and had a look of horror over her face when shown them. She said the defendants "told a lot of lies when they were on the witness stand" that she did not believe. Primarily, she could not fathom that anyone could look at the child and think he appeared normal. She added that it was impossible to square the statements of Dr. Peretti, who had done several autopsies of children, and Dr. Whitton, who deals with premature babies, who said the child was among the worst they had seen, with a parent saying that the child's condition did not alarm them.

Judge Garrett reviewed the elements of the crime in detail and determined that the evidence proved beyond a reasonable doubt that both defendants' actions in failing to

provide proper sustenance to the baby and failing to seek medical treatment of the baby evidenced such a disregard of the interest of others that it was a gross deviation below the standard of care expected of a reasonably careful person under the circumstances.  That behavior also caused unjustifiable pain and suffering to the child.

In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979).  "[I]t is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial."  Cavazos v. Smith, 132 S.Ct. 2, 4 (2011).

Petitioner raised a sufficiency of the evidence challenge in his direct appeal.  The state appellate court set forth the evidence in great detail, noted the elements of the crime, the Jackson standard of review, and the trial court's detailed reasons for the verdict.  The court stated that the "bottom line is that the state proved that these defendants criminally mistreated this child, resulting in his death due to malnutrition."  State v. Woods, 16 So.3d at 1281-88.

Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d).  Thus a state-court decision rejecting a sufficiency

challenge is reviewed under a doubly deferential standard.  It may not be overturned on federal habeas unless the decision was an objectively unreasonable application of the deferential <u>Jackson</u> standard.  <u>Parker v. Matthews</u>,132 S.Ct. 2148, 2152 (2012).

This was a tragic case that has resulted in the death of a child and life sentences for his parents.  One could scour the record and find points to be made to support an argument that Petitioner was not guilty beyond a reasonable doubt of the elements of the crime.  But there was also abundant evidence that supported the trial judge's view that Petitioner ignored an obviously malnourished baby and did not attempt to adequately feed the child or get medical attention.  When the evidence is viewed in the light most favorable to the prosecution, a rational trier of fact could have found the elements of the crime beyond a reasonable doubt.  More important, there is no basis to determine that the state appellate court's decision rejecting the sufficiency challenge was an objectively unreasonable application of the deferential <u>Jackson</u> standard.  Accordingly, habeas relief is not available on this claim.

This conclusion is reinforced by the decision in <u>Cavazos</u>, where the Supreme Court faced a record that included competing expert views of how a baby died, and the expert theory offered by the prosecution had been seriously undermined by later scientific studies and opinion.  The Court conceded the doubts about the petitioner-grandmother's guilt were understandable, but the jury had decided the issue, and its decision was supported by the record. <u>Cavazos</u>, 132 S.C. at 7.  Habeas relief under the demanding Section 2254(d) standard was not permitted.  (The governor of California later commuted the petitioner's sentence.)

**Ineffective Assistance of Counsel**

   **A.  Reference to Fat in Autopsy Report**

   The State's theory of the case was that Emmanuel's parents did not feed him enough, and the child starved to death.  The defense continually argued that Emmanuel may have suffered from the metabolic disorder MCAD, and there was extensive questioning of the expert witnesses on that issue.  Dr. Peretti testified that his autopsy revealed no evidence of MCAD because that disorder would have resulted in fat deposits on the liver and other organs.  Dr. Whitton gave similar testimony and added that the Tulane medical records showed that genetic testing ruled out an initial false positive indication of MCAD.

   Petitioner raised in his post-conviction application a point that was not discussed at trial.  Dr. Peretti's autopsy report included notes on the condition of various organs such as the lungs, liver, and kidneys.  There was no mention of fat on the liver, but the entry for the kidneys and adrenal glands read as follows:

>   Cross sections of the entire kidneys are examined.  Renal parenchyma is unremarkable.  Nephrons and tubules are free of significant inflammation. *Only rare fragments of brown fat are detected in the renal hilum.* (Emphasis added).

Tr. 154.  The hilum is defined as the depression at the mid-line of the kidney through which passes the renal vessels and nerves.  In layman's terms, it is the recessed part of the kidney where it attaches to the urinary system.

   Petitioner argues that counsel was ineffective because (1) he did not object to or cross-examine Dr. Peretti's testimony on the basis of the brown fat reference, (2) did not object to

the prosecutor's knowing use of perjured testimony in the form of Peretti's opinion about MCAD, and (3) did not object to Dr. Whitton's testimony based on the brown fat reference. To prevail on such claims of ineffective assistance of counsel, a petitioner must establish both that his counsel's performance fell below an objective standard of reasonableness and that, had counsel performed reasonably, there is a reasonable probability that the result in his case would have been different.  Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984).

Petitioner first presented these arguments in his post-conviction application.  Judge Michael Pitman construed the arguments as attempts to reargue the sufficiency of the evidence claim that was presented on appeal.  He found the claims were, therefore, repetitive and procedurally barred, but he also addressed them on the merits and with reference to the Strickland standard.  His brief written opinion characterized the arguments as conclusory, failing to demonstrate how Dr. Peretti's testimony was false, and generally lacking merit. He also stated that there was not a reasonable probability that the outcome would have been different had counsel acted as suggested.  Tr. 802-05.

The state appellate court noted that Petitioner alleged that his trial attorney provided ineffective assistance "for a variety of reasons," and it found that the trial court "did not err in denying [Petitioner's] application."   The court's only analysis was a one-sentence statement that Petitioner "failed to prove that his attorney's performance was deficient, or that the alleged deficient actions or omissions prejudiced his case."  Tr. 894.  The Supreme Court of Louisiana denied writs without comment.  Tr. 1008.

Petitioner's claim was adjudicated and denied on the merits by the state court, so 28 U.S.C. § 2254(d) directs that the question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether the determination was unreasonable, which is a substantially higher threshold. Schriro v. Landrigan, 127 S.Ct. 1933, 1939 ( 2007).  The Strickland standard is a general standard, so a state court has even more latitude to reasonably determine that a defendant has not satisfied it.  The federal court's review is thus "doubly deferential." Knowles v. Mirzayance,129 S.Ct. 1411, 1420 (2009).

"If this standard is difficult to meet, that is because it was meant to be."  Harrington v. Richter, 131 S.Ct. 770, 786 (2011).  Section 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and reaches only "extreme malfunctions" in the state criminal justice system.  Id.  Thus, "even a strong case for relief  does not mean the state court's contrary conclusion was unreasonable."  Id.

The testimony from all of the experts indicated that significant amounts of fat would have been found on the organs such as the liver and kidney if the child had MCAD.  Dr. Peretti spoke specifically to metabolic disorders on a number of occasions.  He explained that a child with a metabolic disorder would have "a lot of fat stored in the liver."  You can "open them up and see the liver is really fatty."  But in this case the child's liver "was normal."  He added that he also looked at "the kidneys, the heart, all under the microscope, because in metabolic disorders you have the fat stores in the organs.  And there was no fat in any of the organs."  He said that ruled out metabolic disorders "because there's no fat in the organs."

Tr. 276.  The cross-examination of Dr. Peretti by both defense counsel included several questions about the potential presence of MCAD.  Dr. Peretti repeated that it "causes fat to be deposited in the kidney, heart, and liver; and it causes the children to have cerebral edema, or swelling of the brain."  He said Emmanuel "had none of those."  Tr. 281.

No attorney asked Dr. Peretti about his reference in the autopsy to "only rare fragments of brown fat" detected in a part of the kidney, but that single reference is not enough, in light of the other material of record, to establish that counsel was ineffective or that Dr. Peretti or Dr. Whitton testified falsely.  It is merely one possible avenue of cross-examination, which might have been easily explained by the experts.  Perhaps it would have helped the defense to some extent, but the fact remains that the child had no indication of fat on his heart, liver, or other areas of the kidney.  He also lacked cerebral edema or any other indication of MCAD.

The state court was reasonable, under these circumstances, in determining that counsel's performance did not fall below an objective standard of reasonableness.  And the state court was certainly reasonable in finding that, had counsel asked questions on this point, there was not a reasonable probability that the verdict would have been different.  When the entire body of medical evidence is considered, together with the reasons stated by the trial judge, there is no reasonable basis to believe Judge Garrett would have acquitted Petitioner or found him guilty of a lesser offense.  The state court's adjudication of this claim, although perhaps debatable, was within the realm of reasonableness that bars a federal court from

overturning the verdict under Section 2254(d).  Petitioner is not entitled to habeas relief on any of these claims.

### B.  No Hearsay Objection

Petitioner asserts that his counsel was ineffective because he did not raise a hearsay objection to the testimony of Dr. Whitton, who relied upon the contents of medical records from the Tulane Medical Center.  Petitioner contends that Whitton's reference to the medical records to support his testimony that the child did not have MCAD was a violation of the Confrontation Clause, similar to the reliance upon crime lab certificates in Melendez-Diaz v. Massachusetts, 129 S.Ct. 2527 (2009) to prove, without testimony from lab analysts, that seized material was cocaine of a certain quantity.  Melendez-Diaz held that the admission of the certificates violated the holding in Crawford v Washington, 124 S.Ct. 1354 (2004) that the Confrontation Clause bars the introduction of "testimonial" evidence against a defendant unless the proponent shows that the declarant is unavailable and that the defendant had a prior opportunity for cross-examination.

This case went to trial in 2008, so the trial judge and two experienced defense attorneys would have been familiar with Crawford and related decisions.  The trial commenced with a discussion of the Tulane medical records.  The attorney for Ms. Woods said that the State had provided the defense all available medical records.  It had been brought to his attention that the certification of the records was lost, but he had "no problem stipulating to that certification" for trial.  Counsel for Petitioner said that he would also "stipulate to the certification on this." Tr. 220-21.  When Dr. Whitton was called to testify,

Page 20 of  26

the prosecutor offered the certified Tulane medical records as an en globo exhibit.  Counsel

for  Ms. Woods stated that "We have already stipulated to that," and counsel for Petitioner

added that he had "No objection on behalf of Mr. Scott."  The records were admitted into

evidence.  Tr. 300-01.

Dr. Whitton's testimony drew heavily upon the Tulane medical records.  Neither

defense counsel raised a hearsay objection, and some of the cross-examination pointed out

aspects of the records, such as the child's difficulty with suck and swallow, that favored the

defense.  The defense later called Dr. Singh, who also testified extensively about the content

of the medical records and what they indicated about the health of the baby.

The rules of evidence have long allowed an expert to offer an opinion based on facts

or data he has been made aware of or observed, even if the materials themselves are not

admissible to prove the opinion.  F.R.E. 703, L.C.E. 703.  The Supreme Court has held that

this form of expert testimony may not, under proper circumstances, violate the Confrontation

Clause if the defendant has the opportunity to cross-examine the expert about any statements

that are offered for their truth.  Williams v. Illinois, 132 S.Ct. 2221 (2012).

Petitioner first presented this claim in his post-conviction application.  Judge Pitman

denied the claim with an observation that the decision of whether to object to evidence is a

tactical decision made by counsel and is part of the trial strategy.  He gave deference to such

decisions, with the strong Strickland presumption that counsel exercised reasonable

professional judgment.  Tr. 804.  Habeas relief is not available on this claim unless that state

court adjudication was an objectively unreasonable application of Strickland.

It is likely that counsel could have excluded some of Dr. Whitton's testimony about the content of the medical records had he raised a <u>Crawford</u> objection.  By doing so, however, he might have deprived himself of the ability to rely upon testimony from Dr. Singh that the medical records contained matters beneficial to the defense such as an initial screening that indicated the possibility of MCAD, records of the child having difficulty sucking and gaining weight, and the like.  The record does not reflect all that went into the decision-making, but it is entirely possible that the prosecution and defense elected to stipulate to the admission of the medical records, and testimony about them, rather than subpoena the Tulane medical professionals from a city more than five hours distant.  Such an agreement would be entirely reasonable, given the expenses involved, when both the prosecution and defense intended to rely upon the content of the medical records as interpreted by their respective local experts.

The Fifth Circuit addressed an attorney stipulating to evidence in <u>Mattio v. Cain</u>, 267 Fed. Appx. 389, 391 (5th Cir. 2008).  The Court noted that the petitioner did not articulate an alternative strategy that should have been employed.  Thus, he failed to overcome the strong presumption that counsel's decision to stipulate was sound trial strategy.  <u>See also</u> <u>Gaddis v. Warden</u>, 2010 WL 2291998, *5 (W.D. La. 2010) (counsel may make reasonable stipulations regarding evidence without abandoning the adversarial role).  And the Fifth Circuit has recently held that an attorney may waive his client's right of confrontation under <u>Crawford</u> by stipulating to the admission of evidence so long as it can be said that the

attorney's decision was a legitimate trial tactic or part of a prudent trial strategy.  U.S. v. Ceballos, 2015 WL 3756160, ____ F.3d ___ (5th Cir. 2015).

Counsel could have raised a hearsay objection to aspects of Dr. Whitton's testimony, as suggested by Petitioner, but pursuing such an argument might have prevented the favorable testimony of the defense expert who also drew heavily upon the records.  Counsel need not make every conceivable objection to be effective, and the record in this case supports the decision of the state court that the lack of an objection in this case was part of a reasonable trial strategy.  Accordingly, the state court's rejection of this claim was not an objectively unreasonable application of Strickland.

### C.  No Evidence Petitioner Sought Medical Care

Petitioner asserts that he "specifically put his defense counsel on notice that he had personally sought medical care for his son on several occasions."  He claims that he provided counsel with the name and location of a hospital where he took Emmanuel, the names of the medical personnel who examined the child, where counsel could find a medical card that Petitioner used for that purpose, and the dates Petitioner visited the hospital.  He contends that counsel ignored these demands and did not present the favorable evidence.

When Petitioner first presented this claim in its post-conviction application (Tr. 766-68), he offered no more facts than he has in his federal petition.  He claimed that he provided counsel with the name and location of a hospital, but he did not provided that information to the court.  Similarly, he did not identify the medical personnel, explain where the mystery medical card could be found, or identify the dates at issue.  Judge Pitman denied the claim

because Petitioner did not explain how this unidentified evidence would have lead to a different outcome. Tr. 804.

A habeas petitioner who alleges a failure to investigate on the part of his counsel "must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." Gregory v. Thaler, 601 F.3d 347, 352 (5th Cir. 2010). To prevail on an ineffective assistance claim based on uncalled witnesses, the applicant must name the witness, demonstrate that the witness would have testified, set out the contents of the proposed testimony, and show that the testimony would have been favorable.  Id.

This claim must be adjudicated under Section 2254(d)(1), and Petitioner must overcome the limitations of that statutory standard "on the record that was before the state court." Cullen v. Pinholster, 131 S.Ct. 1388 (2011).  It is reversible error for a district court to hold a federal hearing to flesh out such a claim.  Pape v. Thaler, 645 F.3d 281, 288 (5th Cir. 2011).  Petitioner offered the state court nothing but conclusory assertions that more investigation or calling unidentified witnesses would have helped the defense.  That is woefully insufficient to meet his burden of showing that the state court's adjudication of this final Strickland claim was not only wrong but unreasonable.  Habeas relief is not permitted.

Accordingly,

**IT IS RECOMMENDED** that Petitioner's petition for writ of habeas corpus be denied.

**Objections**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b).  Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days

from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 22nd day of July, 2015.


Mark L. Hornsby
U.S. Magistrate Judge